NORTH STAR, The. See Case No. 16,839.

NORTHUMBERLAND, The (HINCKLEY v.). See Case No. 6,511.

NORTHUMBERLAND BANK (BANK OF THE UNITED STATES v.). See Case No. 931.

## Case No. 10,333.

### The NORTHWESTER.

[10 Adm. Rec. 415.]

District Court, S. D. Florida.   March 25, 1873.

SALVAGE—MISCONDUCT OF SALVORS—COMPENSATION.

[1. The action of salvors, after saving most of the cotton from a burnt and stranded vessel, in quitting the work, leaving forty-six bales of cotton in the wreck and undiscovered, *held* to show remissness in their duty, although there was no intentional wrong, but merely a failure to use proper and sufficient means to ascertain the true condition of affairs; but this cotton having been afterwards saved by vessels which returned to the wreck, after the original enterprise was abandoned, *held*, that the original salvors should not be punished except by losing the salvage thereon.]

[2. Failure or refusal of salvors to interrupt the work of saving cotton from a hulk for the purpose of rescuing an anchor and chain, and sails, rigging, and spars, which are in a badly damaged condition, at the request of the master, is not to be regarded as misconduct.]

[3. Where twenty-five vessels and two hundred and twenty-nine men were engaged fifteen days in extinguishing fire and saving cotton from a burnt and stranded hulk, near the harbor of Key West, most of it by diving, and under conditions rendered peculiarly disagreeable and injurious, both above and below water, by reason of burnt bales of tobacco in the wreck, the weather being part of the time cold and boisterous, *held*, that twenty per cent. should be allowed upon the value of cotton saved dry; thirty-three and one-third per cent. upon that wet and burnt; forty per cent. of the proceeds of cotton, stores, and material so badly damaged as to necessitate their sale; fifty per cent. of the pro-

ceeds of small lots of cotton picked up adrift and saved from total loss; and fifty per cent. of the proceeds of iron, bolts, rings, etc., saved by diving from around the hulk.]

[Cited in Baker v. The Slobodna, 35 Fed. 543.]

[This was a libel by Joseph Roberts and others to recover salvage from the cargo and materials saved from the ship Northwester.]

L. W. Bethel, for libellants.

W. C. Maloney, Jr., for respondent.

LOCKE, District Judge. This ship, laden with 2,979 bales of cotton, a few hogsheads of tobacco, and 45 tons of bonedust, while on a voyage from New Orleans to Liverpool, took fire in the vicinity of the Tortugas. Every effort was made to keep the flames under and was partially successful until she was coming in the harbor of Key West, when a violent and sudden squall caused the fire to break out with renewed force, and the vessel, which had been run aground, was soon in flames. She was first boarded by several boats containing officers and men from the naval vessels in the harbor, but their efforts to save her were ineffectual, and she was soon necessarily abandoned. In this condition the libellants and petitioners, licensed wreckers of this district, on the evening of the 23d February, 1873, arrived at the vessel. She was deserted, the master having been worn out by constant exertions to subdue the fire for over 40 hours, and the pilot, in whose charge she had been left, having gone for assistance. Under these circumstances they at once began to throw overboard and take to their vessels cotton from the deck and main hold of the ship until driven off by the approaching flames, when they retreated to their vessels and lay by her through the night. In the morning the vessel was burned nearly to the water's edge in some places, and below the line of the main deck all around the main deck was burned completely off. Much cotton between decks was entirely consumed, the lower deck burnt through in several places, and the fire still progressing. The sides of the ship and the entire surface of the cotton exposed were in a blaze, and the fire working around and under the bales where there was the least space. The salvors that first arrived at the ship scuttled her, and permitted her to fill in order to prevent the fire from penetrating below the water line, and endeavored by all means within their power to put out the fire by throwing water with pails, buckets, and tubs, and finally succeeded in getting a foothold 15 or 20 feet square on the cotton at the bow. At this time the lighthouse steamer Arbutus, which had been employed by the master, arrived with a powerful steam pump and one hand pump, which, with a hand force pump procured by the libellants, commenced to play upon the burning cotton, and finally succeeded in extinguishing the flames, although fire still continued under the surface, and would occasionally break out anew. The Arbutus remained by the ship a day and a half, and for this service has been paid $1,400. The libellants continued playing on the burning cotton, and at the same time loading their vessels with the cotton in which the fire had been extinguished. They continued this work almost constantly, when the weather would permit, until they had, as they thought, saved all in the vessel, when they abandoned the service. After the salvors who had been first consorted left the work, two of the vessels returned by themselves and found, by repeated diving, 46 bales, which have also been saved and brought into port. These are the principal facts alleged and proven. In reply, the energy and activity of the salvors is not denied, neither their good faith nor the value of their services to the property; but it is urged that they were remiss in their duty when they abandoned the work, leaving the number of bales afterwards found in the bottom of the vessel; that they neglected to get and save an anchor and chain, when requested to by the master, and also to save the sails, spars, and rigging, lying alongside the ship. Considering these objections to the conduct of the wreckers as made by the master in his answer:

First. In regard to the fact of leaving 46 bales of cotton, I consider that the principal salvors were remiss in their duty. Not that any actual loss has come to the property, but that there might have been. The representation of the salvors that there was no more cotton was calculated to mislead the master, and had he not been able to raise the bottom of the vessel, but had sold it where it was, there would have been great injustice done the owners. I cannot ascertain that there was any intentional wrong; but I am not satisfied that proper and sufficient means were used to ascertain the true condition of the case. This the master wrecker should certainly have provided for. But they losing the salvage on these bales which were found by other parties I consider a sufficient penalty. The evidence shows that the sails, or nearly all of them, and the running rigging, were burned off before the masts went over the side; that many of the spars were somewhat burned; that the standing rigging was wire, and the masts so fell that it was almost impossible to save anything during the weather such as there was all of the latter part of the service. Under those circumstances, I cannot say that the salvors should have abandoned the saving of cotton for the purpose of saving that of much less value and in no more danger of rapid deterioration. Nor can I say it was their duty to leave the salving of cotton to go to get an anchor and chain. It would have been their duty to have procured it before giving up the service, but before this the master had obtained it by other assistance. The only remaining question is what, under these circumstances, would be a just and reasonable amount to decree for salvage. The

property was in a most perilous and exposed condition,—first to destruction from fire, then from water. The cotton saved dry on the first night was snatched. as it were, from the very flames and from certain destruction, and it was due alone to the energy and immediate activity of the salvors that any of it was saved. Had it not been saved at the very time it was. it would have been entirely consumed. Pieces of the burning sails and rigging were dropping all around while the parties were engaged in this work, and it was not until one of the masts had fallen over the side, and the flames actually drove them from .the vessel, that night, that they abandoned the labor. After the burning off of the upper portion of the ship and cargo, the filling of the ship with water and the active exertions of the officers and men of the steamer Arbutus and the salvors saved the entire remaining portion of the cargo from total loss by fire. It is claimed that the steamer Arbutus put out the fire, and saved the cotton above the water line from burning, and, as she was employed by the master, her labor should not inure to the benefit of the wreckers. Without doubt this steamer rendered most valuable aid, and was instrumental in checking the fire, so that more cotton was saved than would otherwise have been, yet without the immediate and constant exertions of the wreckers in breaking out, .throwing overboard and removing the still burning bales. and continuing the playing of the stream upon it whenever any sign of fire appeared, I can but believe that the saving would have been but temporary, and the fire would have again broken out. It is in evidence that on Wednesday, the day after the Arbutus left, the flames broke out anew, and. I am fully convinced. would have spread and consumed all above the water line but for the presence of the libellants. After the fire had been entirely subdued, and all dangers from that had ceased, the risks of the property had been but partially removed. Both decks, together with the beams, had been entirely burned. and the hull was liable at any time, with an. increase of wind and sea, to fall apart from the weight of the cargo, and the cotton to go adrift. Although the ship was lying inside the points of the reef which form the harbor, she was in a great degree exposed to the force of wind and sea with the wind in some directions. The peril to which the property was still exposed was very great, and the danger of total loss imminent. The labor by which the property has been saved has been extremely laborious, and accomplished with considerable risk to the health. if not to life. The ship contained a few hogsheads of tobacco, some between decks. and some in the lower hold. The burning of that between decks rendered the labor in the smoke while putting out the fire particularly unpleasant and injurious to the eyes, and that in the hold rendered the water peculiarly disagreeable to dive in.

About if not quite two-thirds of the entire amount saved was saved from under water, and much of it by diving. The testimony shows that although some of it floated when broken out, very much of it did not, and every bale had to be secured by diving, the tobacco and bonedust making the water peculiarly disagreeable and noxious. The bales were very heavy, weighing. when wet, as they were, from 1,400 to 1,600 pounds, which rendered the handling of them with such appliances as could be used necessarily slow, tedious, and laborious. The ship's spars were gone, and there were no means for hoisting except what were rigged from the salvors' vessels. The weather during the service part of the time was moderate, but some of it was particularly boisterous, cold, and windy. The service continued through 15 days. the first four of which the wreckers worked both day and night. During the entire time there was but one day but what the work was going on. and then it was suspended on account of the inclemency of the weather. There were 25 vessels and 229 men consorted in the service,—a force though. larger, probably,. than was necessary. Considering the peril in which the property was. the exposure and risk to the health of the libellants, the amount of labor. and the unpleasant circumstances under which it was performed, this must be considered as salvage services of far more than ordinary merit. The bark Delphos.— Union Towboat Co. v. The Delphos [Case No. 14.400].—laden with cotton, while coming down the Mississippi river, preparatory to going to sea. was discovered to be on fire. Sue was towed back to an anchorage, scuttled, and sunk. She was then pumped out, taken up, and carried to New Orleans. There were five towboats engaged five days in the service. but the court considered three to have been sufficient. In this case the court declared 45 per cent. to be a reasonable salvage, and decreed 15 per cent. to one-third of the salvors. The steamer T. P. Leathers, —Montgomery v. The T. P. Leathers [Id. 9.736].—about 60 miles above New Orleans, took fire and ran aground. Another steamer, the Robb, came to her assistance and saved the boat and a part of the cargo, although damaged. The court decreed 33⅓ per cent. 6 Ad. R. In this harbor the ship Otseonthe took fire, while loaded with cotton and corn, and was scuttled and sunk. The master made a contract to recover and save the property. This was done by means of a powerful steam pump, appliances for hoisting, etc., and the contracting party claimed, in conformity with the provisions of the agreement, $10,000. This contract and amount the court approved, and declared that it was the opinion of the court that this amount was reasonable, and no more than a fair compensation for the work and labor performed. This amounted to a little over 35 per cent. of the gross value saved. and about 40 per cent. of the net. In the last case cited the vessel

was immediately in the harbor, and the fire entirely extinguished before the contract was made or the service commenced; so it was but a salvage from impending perils from water, although fire was the original cause. The value saved was very much less than in this case, although the bulk nearly equals. There is one other peculiarity of this case which demands our attention, and that is the proximity of the property to port. I have heretofore spoken of the circumstances in connection with which this fact would vary the amount of compensation to be given, but it might be well to consider the amount of variation to be made on that account. The last case cited is parallel in this respect with the one under consideration. In addition to that, I find others decided in which this fact is similar. In 1853, the Sampson [unreported] got aground at the entrance of this harbor on Whitehead Point, and but a very short distance from where this vessel lay. The wreckers went to her assistance, helped her off, and brought her into the harbor. The court decreed 27 per cent. salvage. The Argus [Case No. 521] went to pieces on Charleston bar, and the cotton was driven ashore on the contiguous islands. 33⅓ per cent. net was given for saving and bringing it to the city. In this case the decks of the ship were burned away, and the hold open and exposed, so that the diving was neither as dangerous or difficult as under decks. The divers receive by agreement an additional compensation of 25 cents a bale, to be paid from the salvage. In the case of The Ocean Belle [Id. 10,402], the court says that the most usual rate of salvage in this court, where the vessel was lost and cargo saved, has been 25 per cent. on the dry, 40 per cent. on the wet, and 50 per cent. on that saved by diving, although this has not been followed at all as a rule, as the cases of The Crown [Id. 3,450], The Emigrant [unreported], and many others show. It may be considered that an increased salvage may be due on account of extinguishing the fire, but the danger from fire and water is merged in the general question of peril, and I cannot consider that after the efforts of the steamer Arbutus the peril of the property was greater than in a stranded ship exposed to a rough sea on an open beach or reef. In both cases immediate assistance is required. In this case I consider that the danger of the property, the danger encountered by the salvors, and the necessary labor have been materially diminished by the proximity of the vessel to the port, and it would be but reasonable that the compensation should be diminished correspondingly. The property saved has been partly appraised and partly sold, at an aggregate value of $85,747.39, and the appraisement accepted and sale confirmed: and I consider that after paying the costs, expenses, and charges, 20 per cent. of the appraised value of the cotton saved dry, 33⅓ per cent. of that appraised and classed as wet and burnt, and 40 per cent. of the proceeds of stores and cotton and materials so badly damaged as to be sold, and 50 per cent. of the proceeds of many small lots of cotton that went adrift and have been picked up a considerable distance from the vessel, which have been recovered from a total loss, as well as 50 per cent. of the proceeds of iron, bolts, rings, etc., picked up by diving around the ship, and where she was since her removal, is adjudged to be a reasonable salvage. And the decree will follow accordingly. The amounts will not give a very liberal sharing among the number engaged, but I consider would have liberally rewarded a number no larger than absolutely necessary to have rendered the service.

And the decree follows: "This cause having been fully heard, and the court being duly advised in the premises, and the materials and stores saved from the said ship Northwester sold for one thousand and sixty dollars and four cents, and the cargo, badly damaged and perishing, saved, sold for ten thousand two hundred and fifty dollars and thirty-five cents, and the remainder appraised at seventy-four thousand four hundred and thirty-seven dollars, and the appraisement having been accepted, and no objection made thereto by either party, it is now ordered, adjudged, and decreed that said sales be confirmed and said appraisement accepted and adopted, and that there be deducted from the values thus found the costs, charges, and expenses herein incurred, including the marshal's, clerk's, and appraiser's fees, the libellant's proctor's docket fee, the wharfage, and labor, shortage for one month, and that the libellants and petitioners herein have, receive, and recover in full for their services herein alleged and proven, twenty per cent. upon the net value of the cotton saved dry, thirty-three and one-third per cent. upon that saved wet, but not so badly damaged as to be sold, forty per cent. of the net proceeds of sale of the stores and materials and cargo saved so badly damaged as to be sold, except as hereinafter provided, and fifty per cent. of the net proceeds of sale of sundry small lots of cotton picked up adrift and such small portions of the rigging and materials as were picked up adrift or dived up from the bottom. That this include all claims for salvage on property saved, and the prayer of petitioners Saunders and Griffin for a distributive share be denied. And that it be referred to the clerk of the court, as commissioner, to compute said salvage under the direction of the court, in accordance with this interlocutory decree."

And on the 9th day of April, 1873, a further decree was rendered: "Upon further consideration of this cause, in pursuance of the decree heretofore pronounced, it is ordered, adjudged, and decreed, that the libellants have, receive, and recover, in full for compensation rendered in saving cargo, ma-

terials, and stores from said ship Northwester twenty-four thousand, eight hundred and two dollars and seventy-eight cents; that petitioner D. A. Walcott have, receive, and recover five hundred and thirteen dollars and twenty-six cents; that petitioner James C. Sands have, receive, and recover sixty-three dollars and fifty-five cents; that petitioners Saunders and Griffin have and recover two hundred and thirty-four dollars and thirty-four cents; that petitioners John Russell and George Sweeting have and recover seven hundred and fifty-four dollars and seventy-six cents, to be divided according to their respective interests; that petitioner George Bethel have and recover one hundred and fifty-nine dollars and thirty-nine cents; and that there be paid to sundry parties for salving small lots of materials and cargo picked up adrift and dived up from the bottom, and delivered by them to the marshal, and by him sold, according to their several amounts as shown by the account sales, three hundred and nine dollars and eighty-eight cents,—making together the sum of twenty-six thousand eight hundred and thirty-seven dollars and ninety-six cents for salvage. And that upon the payment of said sums, together with the costs, charges, and expenses, against said property as taxed and allowed herein, amounting to five thousand nine hundred and seventy-nine dollars and fifty-two cents, less the costs and salvage paid from proceeds of materials and stores, and less the proceeds of said cargo already received by the marshal, amounting to ten thousand two hundred and fifty dollars and thirty-five cents, into the registry of the court, the marshal restore said cargo now in his custody to the claimant for the benefit of the true owner or owners thereof. And it is further ordered that the salvage herein awarded be divided and apportioned among the salvors entitled thereto, according to the provisions hereof, the standing rules of this court, and the terms of consortship between them, and that the clerk pay said salvage, costs, and expenses to the several persons entitled thereto."